**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**WEST PALM BEACH DIVISION**

**Case No.**

| | |
|---|---|
| JAMES MURRAY,<br><br>Plaintiff,<br>v.<br><br>MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, BRUCE MEYER, JEFFREY PERCONTE, IAN PENNY, and ANTHONY "TONY" CLARK,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND** |

Plaintiff James Murray ("Murray") sues the Major League Baseball Players Association ("MLBPA"), Bruce Meyer ("Meyer"), Jeffrey Perconte ("Perconte"), Ian Penny ("Penny") and Anthony "Tony" Clark, ("Clark") (collectively, "MLBPA Defendants"), and alleges:

## THE PARTIES

1. Plaintiff Murray resides in Juno Beach, Florida.

2. Defendant MLBPA is an unincorporated association with its principal place of business at 1325 Sixth Avenue (Avenue of the Americas), 29th and 30th Floors, New York, N.Y. 10019. It administers its own regulation of agents, controls their certification and exercises significant influence over access to players.

3. Defendant MLBPA does substantial, continuous and systematic business in Florida, including:

   a. Attending substantial collective bargaining negotiations during the lockout in Jupiter, Florida, including the MLBPA specifically requesting these

negotiations occurring in Florida so players could attend their pre-spring training workouts. This was followed by some nine days of daily meetings that were followed by mainstream media in at least 28 sources;

b. Appearances by MLBPA representatives to present trophies in Miami in 2023;

c. Upon information and belief, every single February and March for decades, the MLBPA sends its executive staff, and legal teams into Florida (the Grapefruit League) to conduct mandatory union business, player representation meetings and regulatory oversight across dozens of Florida facilities;

d. The MLBPA has availed itself of Florida jurisdiction by actively choosing to create, fund, and register a for-profit corporate subsidiary called Players Way LLC, in Windermere, Florida.[1]

4. Defendant Clark at all relevant times was the Executive Director of the MLBPA and upon information and belief is an individual who is a citizen of the State of Arizona, domiciled in the Phoenix metropolitan area, and is not a citizen of Florida.

5. Defendant Meyer at all relevant times was the Deputy Executive Director of the MLBPA and upon information and belief is an individual who is a citizen of the State of New York, domiciled in the New York metropolitan area, and is not a citizen of Florida.

6. Defendant Perconte was an MLBPA attorney and Agent of the MLBPA and upon information and belief is an individual who is a citizen of the State of New York, domiciled in the New York metropolitan area, and is not a citizen of Florida.

---

[1] Players Way LLC is not a Delaware LLC, having withdrawn its Florida registration in or about April 3, 2026

7. Defendant Penny was an MLBPA attorney and Agent of the MLBPA and upon information and belief is an individual who is a citizen of the State of New York, domiciled in the New York metropolitan area, and is not a citizen of Florida.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 in that there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest.

9. This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. §1331 and Section 301 of the Labor Management Relations Act ("LMRA") 29 U.S.C. §185. This action involves the violation of a labor contract and governing regulations between an individual bound by a labor organization's regulatory framework and the labor organization itself. Under 29 U.S.C. §185(a), this Court has jurisdiction without respect to the amount in controversy and without regard to the citizenship of the parties.

10. This Court has personal jurisdiction of Defendant MLBPA and the MLBPA Defendants pursuant to 29 U.S.C §185(c)(2) because the MLBPA is a labor organization whose duly authorized officers, executives and agents are continuously and systematically engaged in representing, advising and acting for employee-members (Major League Baseball players) within this judicial district, most notably through its, recurring annual Spring Training operations, Grapefruit League facility oversight, and active regulation of Florida-based player representation and additional allegations contained in Paragraph 3 above.

11. This Court has personal jurisdiction of Defendants Clark, Meyer, Perconte, and Penny because they purposefully availed themselves of the privileges of conducting business in the State of Florida by executing union duties on Florida soil, managing regulatory operations

directly impacting Florida sports agencies, committing tortious acts of interference and breaches of the law there that were specifically targeted at Murray and caused devastation to him operating within this judicial district.

12. Venue is proper pursuant to 28 U.S.C. §1391(d) as Murray resides in Juno Beach and Defendants have done significant and continuous business, and is subject to personal jurisdiction, in this District. Likewise, venue is proper in this District under 29 U.S.C. §185(c) because it is the District from which Murray carried out his duties as a certified player's agent of the MLBPA.

## INTRODUCTION

13. This is a civil action arising under the laws of the United States to remedy Defendants' intentional, malicious, and bad-faith acts including Breach of Contract/Breach of Good Faith and Fair Dealing, Tortious Interference with Contract, Intentional Interference with Economic Advantage, and alternatively, Fraud in the Inducement.

14. Prior to initiation of any formal disciplinary review, the MLBPA Defendant Clark explicitly, systematically, and maliciously stated an intent to "destroy" Murray and permanently eject him from his livelihood as an MLBPA-certified agent.

15. Following these targeted threats, the MLBPA Defendants weaponized the union's disciplinary and regulatory apparatus to coerce Murray into a restrictive settlement agreement. The MLBPA Defendants then immediately and intentionally sabotaged that agreement by threatening other certified agents with possible discipline if they associated or worked with Murray, completely paralyzing Murray's business.

16. Because the union's highest executive leadership exhibited deep-seated personal animus, hostility, and a pre-determined agenda to destroy Murray, any attempt to force Murray

into its internal regulatory grievance procedures or arbitration would be completely futile. Thus, Murray is legally excused from exhausting internal remedies and he files this action seeking immediate judicial intervention.

## ALLEGATIONS OF FACT

### A. Plaintiff Murray's Successful and Respected Career as Player's Agent.

17. Until the MLBPA Defendants commenced their scheme to destroy Murray's career as a professional baseball agent for some twenty-five years, Murray had an illustrious and respected reputation. His highly regarded standing in baseball rested on decades of relationships with players, families, agents, club executives, and league personnel.

18. His work included negotiating player contracts, advocating for player rights, developing contract strategy, providing player-development and career advice, securing marketing opportunities, recruiting, and helping manage a team serving a substantial baseball clientele.

19. Trust was the essential asset supporting each of those activities.

20. Over his career, Murray has represented an estimated 300 players and participated in more than $2 billion in player contracts.

### B. Defendant MLBPA and Clark's Plan to Destroy Murray's Career.

#### i. The Certification Process.

21. Yet all of this came to a crashing end when Defendant Clark as Executive Director, along with the other MLBPA Defendants initiated a plan to destroy Murray's career, thus, eviscerating his reputation, contractual rights and future economic advantages.

22. In order to represent professional baseball players as an Agent, one must be certified by the MLBPA. The certification and renewal process is subject to the MLBPA Regulations Governing Player Agents which are promulgated through the MLBPA Executive Board.[2]

23. The source of the MLBPA's authority to adopt and enforce these Regulations is its status as the sole and exclusive bargaining agent for all Major League Baseball Players and all who may become Major League Baseball Players pursuant to Section 9(a) of the National Labor Relations Act ("NLRA") and the collective bargaining agreement in effect among the Major League Baseball Clubs.

24. Section 9(a) of the NLRA provides, in pertinent part:

> Representatives designated or selected for the purposes of collective bargaining by the majority of the employees of a unit appropriate for such purposes, shall be the exclusive representatives of the all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employee or other conditions of employment.

25. The Basic Agreement between the MLBPA and the Clubs provide in pertinent part, as follows:

> <u>ARTICLE II-Recognition</u>
>
> The Clubs recognize the Association, as the sole and exclusive collective bargaining agent for all Major League Players, and individuals who may become Major League Players during the terms of this Agreement, with regards to all terms and conditions of employment, provided that an individual Player shall be entitled to negotiate <u>in accordance with the provisions set for in this Agreement</u> (1) an individual salary over and above the minimum required established by this Agreement and (2) Special Covenants to be included in an individual Uniform Players' Contract, which actually or potentially provides additional benefits to the Player. (Emphasis supplied).

* * *

---

[2] MLBPA Regulations Governing Player Agents (as amended December 2019), Section I - Introduction, at 1.

> ARTICLE IV-Negotiation and Approval of Contracts
>
> A Player, if he so desires, may designate an agent to conduct on his behalf, or to assist him in, the negotiation of an individual salary and/or Special Covenants to be included in his Uniform Player's Contract with any Club, provided such agent has been certified to the clubs by the Association as authorized to act as a Player Agent for such purposes. (Emphasis supplied).
>
> * * *
>
> If the Association has notified the Office of the Commissioner that a player has designated a certified Player Agent or Agents to act on his behalf for the purpose described in the Article IV, no Club may negotiate or attempt to negotiate an individual salary and/or Special Covenants to be included in a Uniform Player's Contract with any Player Agent(s) other that such Player Agent(s).[3]

### ii. Reasonableness Standard Inherent in Labor Organizations' Regulations.

26. Under the Federal labor laws, labor organizations like the MLBPA are authorized to adopt and enforce reasonable rules and regulations that further their legitimate interests.[4]

27. The stated goals of the MLBPA's objectives in regulating Agents are to:

a. Establish and enforce minimum requirements and uniform standards of conduct and fiduciary responsibilities for all Player Agents, Expert Agent Advisors and Applicants seeking to become Player Agents, Player Agent Advisors;

b. Afford Players the opportunity to select an Agent who has agreed to abide by the regulations and represent or advise Players honestly, competently, loyally, and zealously as a fiduciary and in harmony with a Player's membership in a collective bargaining unit;

c. Afford each Player the opportunity to make better—informed decisions about his choice of certified Player Agent, by making available a comprehensive disclosure of facts relevant to the ability of a person to serve as a fiduciary representative or Advisor of Players, and by regulating the conduct of those persons who are engaged on behalf of

---

[3] *Id.* at 2.
[4] *Id.* (emphasis added).

Player Agents, in the functions of an Expert Agent Advisor or in Recruiting and providing Client Maintenance Services for Players;

d. To ensure Player Agents and Advisors who are affiliated with other persons and entities act in the best interests of the Players they represent and do not allow affiliated persons or entities to engage in conduct violating these Regulations;

e. To ensure uniformity and consistency and the rules and standards application to Player Agents whose business activities are often national or international in scope, notwithstanding the different, and sometimes inconsistent, laws, rules and regulations of the many national, state, and local jurisdictions that might otherwise govern these activities, and;

f. Provide Players and Agents with fair, cost-effective and expeditious procedures for privately resolving disputes concerning their relationships, transactions or contractual obligations.[5]

28. As such, the MLBPA controls, through its real and perceived authority, an agent's ability to earn a living in representing baseball players.

**C. Defendants Clark, Meyer, Perconte and Penny.**

29. At all times relevant hereto, in his position as Executive Director of the MLBPA, Defendant Clark was responsible for the process of investigation, discipline and settlement of matters involving the discipline of certified agents of the MLBPA.

30. At all times relevant, Defendant Meyer served as Deputy Executive Director and is charged with the responsibility for legal and labor matters and also for the process of investigation, discipline, and settlement of disciplinary matters involving agents. Defendant Meyer also makes recommendations to a Board for further consideration.

31. Upon information and belief, Defendants Clark and Meyer directed, approved, or substantively reviewed the central accusation and their dissemination of the Notice of Action and other information regarding Murray.

---

[5] *Id.*

32. At all times relevant, Defendant Perconte was an MLBPA attorney and agent of the MLBPA involved in agent regulation, and he led the investigation, disciplinary communications, settlement discussion and subsequent agent presentation that discussed Murray's discipline and intentionally misrepresented that agents could not do business with Murray.

33. Perconte received correspondence expressly denying that Murray purposefully withheld evidence and explaining responsibility for alleged discovery deficiencies.

34. At all times relevant, Defendant Penny was an attorney and agent of the MLBPA involved in the agent regulation process involving Murray. Penny participated in the investigation and decisions concerning agent restrictions in dissemination to agents.

35. On or about November 28, 2023, Murray learned that the MLBPA had initiated an investigation into his actions.

36. While the regulations are meant to be drafted and applied reasonably, from early in the investigation, Murray learned that the MLBPA and Defendant Clark, in particular, were committed to "taking down" Murray.

37. Indeed, Murray was informed that Clark confided to a reporter that he was going to "get rid of" Murray as a certified agent.

38. Murray was informed throughout that the MLBPA intended to decertify him.

39. This information was intentionally leaked to the media with the particular aim to harm Murray and to accomplish the stated goal of Clark and the MLBPA, to "get rid of" Murray.

40. At the time, Murray learned of the MLBPA's intent, Clark and the MLBPA knew that Murray had a contractual relationship with his employer, WME Sports LLC ("WME").

41. At the time Murray learned of the MLPBA's intent, Clark and the MLBPA knew that Murray had specific relationships with individual Players to represent them in the Players negotiations with the management of Major League Baseball Clubs.

42. The initiation of the disciplinary procedure against Murray was intentionally designed to interfere with his contractual and other business relationships.

**D. The Interference in the WME-Murray Contract.**

43. One such relationship was with a client of Murray who terminated his relationship with him and signed with a rival agency due to rumors concerning the then ongoing investigation.

44. Further, the actions of Defendant Clark and the MLBPA Defendants were also designed to tortiously interfere with Murray's contractual and other legal rights in that, upon information and belief, Murray's last employer, WME Sports LLC ("WME") was compelled, in part, to terminate Murray's employment after it learned of the investigation and after the MLBPA selectively determined that the acquisition of WME's parent company by Silver Lake, a private equity firm that had ownership interests in certain minor league baseball teams, created a non-waivable conflict of interest that could only be resolved by terminating Murray's contract and dissolving WME's baseball group.

45. The MLBPA's action against WME was taken despite the fact that the MLBPA had not taken action against other agents and agencies that entered into similar business arrangements.

**E. The Issuance of the Notice of Discipline and Intentional Effort to Effectuate the Plan to Get Rid of Murray.**

46. On or about May 20, 2025, the MLBPA issued a Notice of Discipline against Murray revoking his Agent Certification based upon alleged violations of Agent regulations from

five years prior, during what the MLPBA asserted were "bargaining negotiations that were prompted by the COVID-19 pandemic."

47. Thus, the decertification, which was to take effect if an appeal was unsuccessful, banned Murray from negotiation, administration and enforcement of a Player's rights pursuant to: a) any Uniform Players Contract, the Basic Agreement or Major League Rules; and b) recruiting or providing Client Maintenance Services on behalf of a Player Agent unless, such activity was done on an occasion or was done by a person or entity that does not recruit players and is independent and unaffiliated with a person or firm recruiting that player.[6]

48. Upon information and belief, Clark recommended that the MLBPA pursue an investigation against Murray some three years AFTER the alleged incidents of violations of regulations.

49. The investigation only came about AFTER Clark and his MPBLA employees faced scrutiny by Murray as he pursued aggressive representation of the interests of his clients.

50. On or about June 18, 2025, Murray submitted an Appeal to the Notice of Discipline, Answer, and Grievance.

51. Prior to the date scheduled for a hearing on the Appeal to be heard, the MLBPA and Murray began negotiations to see if a settlement could be reached.

**F. The Settlement Agreement Between the MLBPA and Murray.**

52. The discussions with the MLBPA regarding a potential settlement involved a structure where Murray could continue to do some allowed player agency work under the supervision of a certified agent. On or around September 23, 2025, Murray had discussions in Fort Lauderdale with Michael Stival, a certified agent. Stival, after reviewing the generally

[6] Notice of Discipline, at 1-2; Player's Regulations at 3(A) and 3(B).

proposed settlement structure that would allow Murray to do some limited work, on or about October 29, Stival opined that the structure was something that "we could work with," thus, providing Murray with a concrete prospect for moving forward. Stival did, in fact, reach an agreement with Murray to serve as a supervising certified agent to allow Murray to provide limited services pursuant to the terms of the Settlement Agreement.

53. The MLBPA Defendants knew or should have known that Murray was engaged in talks with Stival and other certified agents to carry out the terms of the proposed settlement, specifically as it allowed Murray's continued limited participation in providing services as regulated by the MLBPA. Prior to the execution of an agreement, Murray's counsel was informed by Defendant Perconte, that there was "nothing public in the works."

54. Based upon these representations and assurances made by the MLBPA, on or about October 29, 2025, a day before the scheduled hearing of the Appeal, the parties entered into an agreement purporting to resolve their differences.

55. The agreement, labeled, "Settlement Term Sheet" (the "Settlement Agreement")[7] revoked Murray's certification for a four-year term, but expressly provided that Murray could continue to engage in some continued activity[8]:

> Mr. Murray may advise and consult with the designate Player Agent(s) for Anthony Volpe, Austin Wells, Jett Williams, and /or Jack Leiter regarding the potential terms of a Uniform Players Contract if all of the following conditions are satisfied prior to such advice or consultation . . .

---

[7] A copy of the Settlement Agreement is not attached because it is confidential and all Defendants have copies of the Settlement Agreement.

[8] The condition of Murray's continued representation through a designated Agent required each player and designated agent to sign an acknowledgment that the player and designated agent had read the Notice of Discipline and understood the terms.

56. Additionally, the Settlement Agreement allowed Murray to provide Client Maintenance Services provided that similar conditions were met in that the Player and Designated Agent understood the terms of the Notice of Discipline, and Settlement Agreement and executed an acknowledgement of same.

57. Finally, the Settlement Agreement expressly provided that Murray could serve as an independent contractor for or be affiliated with an agency or similar entity that employs Certified Player Agents assuming a signed acknowledgment was made by the "highest ranking Executive Officer" or "Legal Officer" that the terms of the Settlement Agreement and Notice of Discipline were understood.

58. Murray's ability to continue to provide certain services, particularly to those with whom he had established relationships, was the *sine qua non* for him to even consider a resolution in advance of pushing forward with his Appeal.

59. Absent these express provisions that allowed him to continue to provide some services under the supervision of another Agent or Agency, Murray would never have entered into the Settlement Agreement.

60. And while Paragraph 6 expressly preserved certain disclosure discretion under Section 7(B)(23) and 4(P)(6) of the Agent Regulations, and Paragraph 8 contained a broad release extending to specified future claims connected to the Notice, investigation and disclosures, the provisions did not allow for falsehoods, misrepresentations regarding the Agreement itself, nor the active and intentional use of publicity to frustrate the purposes of the Agreement itself.

61. The Settlement Agreement contained a provision to require the parties to submit disputes to the MLBPA's arbitration apparatus.

62. Pursuant to the Federal Arbitration Act 9 U.S.C. §10(a)(2), a court must vacate an award—and refuse to compel arbitration—where there is "evident partiality or corruption in the arbitrators."

63. Murray specifically challenges the enforceability, validity, and eligibility of the arbitration provision itself, as well as the entire arbitral selection mechanism dictated by the MLBPA Regulations and in the Settlement Agreement.

64. Under the MLBPA Regulation's structure, the selection, funding and scheduling of the arbitrator are entirely controlled and dominated by the MLBPA's executive staff and legal officers—specifically, Defendants Clark, Meyer, Perconte, and Penny.

65. Because Defendant Clark explicitly declared his pre-determined malicious intent to "take down" Murray and to "get rid of him" before any formal procedures even began, the arbitral forum mandated by the contract is fundamentally corrupted from its inception.

66. These explicit threats made by the MLBPA's top leadership demonstrate a systemic absence of an impartial forum. Forcing Murray to submit this dispute to an arbitration mechanism entirely managed by the very individuals who vowed to financially destroy him, would violate fundamental constitutional due process and turn any proceeding in that forum into an illegal kangaroo court.

67. Furthermore, the arbitration clause itself is unconscionable and unenforceable under federal common law because the MLBPA Defendants weaponized their regulatory monopoly to coerce Murray into signing the agreement.

68. Within minutes of the settlement, the MLBPA resumed their previously stated intent and objective to "get rid" of Murray for good.

69. First, within minutes of the Settlement, the MLBPA leaked the news to New York Times reporter Evan Drellich. Drellich immediately called Murray to confirm the decertification and, by the next day, Drellich had a copy of the confidential settlement agreement. Once he did, he immediately publicized the settlement portraying Murray in a negative light under the headline, "MLBPA bans agent Jim Murray over double dealing with MLB during 2020 COVID negotiations."

70. That same day, prior to Murray being allowed an opportunity to speak with his clients, the MLBPA sent out a memo to Murray's clients including a copy of the Notice of Discipline and Settlement Agreement.

71. Notably, Murray had been admonished just days before merely because he named certain Players on his pre-hearing witness list.

72. Such a blatant act by the MLBPA in threatening Murray with a confidentiality violation when exercising his basic due process rights under the terms of the Regulations only highlights the MLBPA's attempt to get the benefit of shutting down potential criticism of the MLBPA during the FBI investigation of the MLBPA's alleged criminal activities, while exhibiting their underlying intent to frustrate the terms of the Agreement from the start.

73. Their intent became crystal clear thereafter.

74. The intentional effort to destroy any opportunity for Murray to ever resume his career and to breach the Agreement was finalized the week of November 13, 2025, when MLBPA's agent meetings were held in Las Vegas.

75. During one such session, Defendant Perconte presented a 45-minute slide show to all agents in attendance detailing the allegations in the Notice of Discipline and in the Settlement

Agreement. Perconte made it clear that any agent who cooperated with Murray could also be disciplined.

76. An agent attending the meeting noted that Murray had been absolutely "crushed" at the meeting.

77. Thus, due to the MLBPA's statements and actions, agents and players came to believe that Murray was not permitted to work in the industry at all, and that agents and players would be punished if they worked with or even came close to Murray.

78. The presentation and associated communications emphasized disciplinary exposure arising from the mere association with Murray and conveyed that even a compliant arrangement carried unacceptable professional risk.

79. The MLBPA Defendants fully controlled the certification of all the agents upon which the audience and Murray's negotiated continued limited work depended.

80. As a direct consequence, no agent has been willing to engage with Murray to supervise him or employ him in the manner agreed to in the Settlement Agreement.

81. Moreover, no player has been willing to work with him.

82. As a result, Murray has now lost all clients, and his ability to engage in his chosen professional occupation.

83. Without commissions from clients, Murray could bring in no revenue for a company to employ him, thus the MLBPA Defendants have destroyed his livelihood, as well as his reputation.

84. But MLBPA's intentional harm did not stop there. On or about December 12, 2025, Murray's then counsel reached out to the MLBPA requesting clarification on the scope of the Settlement Agreement. Instead of agreeing to a discussion with counsel, the MLPBA once again

sought to punish Murray from exercising his reasonable due process rights by retaliating against him by wrongfully accusing Murray of violating the Settlement Agreement and punitively issuing a document request based upon the unfounded allegation that Murray had been improperly communicating with MLB Clubs.

85. Thus, the MLBPA's course of conduct, starting with its investigation which it conceded was part of a pre-planned effort to "get rid" of Murray; to its representations to induce Murray to enter into a settlement of his pending Appeal which would have served to reveal players dissatisfied with the MLBPA's procedures; to its false guarantees of continued limited work; to its promise of no immediate public disclosures; to its misrepresentations to agents who were willing to provide supervision to Murray; and finally to its threats to bring additional charges against him when Murray sought clarification as to MLBPA's post-execution actions, were all part of an ongoing effort to destroy Murray's ability to work in the industry.

86. Given the above facts, the arbitral forum is thoroughly infected with evident partiality, structural hostility, and bias, rendering the arbitration provision void as a matter of law. Thus, this Court retains exclusive jurisdiction over the matter.

**COUNT ONE**

**BREACH OF CONTRACT/BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (MLBPA and MLBPA Defendants)**

87. Murray repeats and incorporates by reference each allegation contained above.

88. At all times material, the MLBPA Regulations Governing Player Agents and the subsequent fully executed Settlement Agreement constituted valid, binding, and enforceable labor-related commercial contracts governed by Section 301 of the LMRA (29 U.S. C. §185) and federal common law.

89. Under federal labor common law governing Section 301 agreements, every contract contains an implied covenant of good faith and fair dealing. This covenant imposes an absolute duty upon each party to refrain from doing anything that will destroy, injure, or frustrate the right of the other party to receive the fruits, benefits and reasonable expectations of the contract.

90. Murray performed all covenants, conditions, and obligations required of him under the terms of the Regulations and the Settlement Agreement up until the point of Defendants' material breach and frustration of purpose.

91. Defendant MLBPA and the MLBPA Defendants, acting by and through its executive officers, legal counsel and agents, breached the express terms of the Settlement Agreement, the governing regulations and the implied covenant of good faith and fair dealing by engaging in an intentional, bad-faith course of conduct designed to render the performance by Murray impossible, specifically Defendant MLBPA:

a. executed a Settlement Agreement that explicitly permitted Murray to continue earning a livelihood by performing limited sports representation work under the supervision of another certified agent; and

b. immediately and maliciously subverted that same Agreement by holding an agent meeting in Las Vegas for MLBPA-certified agents in which they expressly told agents they could be charged with discipline, including possible revocation of their own certifications if they agreed to supervise or work with Murray.

92. The explicit, bad-faith threats deployed by Defendant MLBPA completely froze the sports agency market for Murray, rendering it utterly impossible for Murray to secure the contractually mandated supervision. The conduct was entirely unaligned with a legitimate union

administration purpose and was executed solely to carry out Defendant Clark's pre-determined threat to "take down" Murray and eliminate him from the industry.

93. By actively blocking, intimidating, and threatening the third-party certified agents required to fulfill the supervisory terms of the Agreement, Defendant MLBPA completely frustrated the purpose of the contract, actively sabotaging its execution, and destroying the exact contractual benefits it had just granted to Murray.

94. As a direct and proximate result of Defendant MLBPA's material breaches of contract and violations of the implied covenant of good faith and fair dealing under Section 301, Murray's business has been entirely paralyzed, resulting in catastrophic and permanent economic damages, loss of player representation fees, total destruction of business equity, and severe reputational ruin in an amount to be proven at trial.

WHEREFORE, Plaintiff Murray demands judgment against the MLBPA, Defendant Clark, Defendant Meyer, Defendant Penny, and Defendant Perconte for:

A. Declaratory and Equitable Relief:

1. an Order declaring the arbitration provision contained within the Settlement Agreement void, unconscionable, and unenforceable due to systemic bias, hostility, and evident partiality under 9 U.S.C. §10(a)(2);

2. an Order declaring that Murray is legally excused from exhausting any internal union grievance or appellate procedures due to absolute futility; and

3. an Order declaring that Defendant MLBPA materially breached the express terms and the implied covenant of good faith and fair dealing embodied in the Settlement Agreement and governing Regulations.

B. Specific Injunctive Relief:

1. a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction strictly restraining and enjoining the MLBPA, its officers, executives, employees, attorneys, and anyone acting in concert with them, from directly or indirectly threatening, intimidating, coercing, or initiating disciplinary proceedings against any MLBPA-certified agent who chooses to work with, contract with, or supervise Murray;

2. an Injunction ordering Defendant MLBPA to issue an official written administrative notice to all active MLBPA-certified player agents explicitly clarifying that working with or supervising Murray under the terms of the Settlement Agreement is fully authorized and will not subject any agent to uniform scrutiny, penalties, or disciplinary action; and

3. an Injunction restraining Defendants from taking any further administrative or regulatory actions to strip Murray of his certification or restrict his business operations pending the final resolution of this case.

C. Monetary and Punitive Damages:

1. an award of actual, compensatory, consequential, and special damages against all Defendants, jointly and severally, in an amount to be proven at trial, including but not limited to lost player representation fees, total destruction of business equity and catastrophic loss of future earning capacity;

2. an award of punitive and exemplary damages against the MLBPA Defendants in their individual capacities for their malicious, fraudulent, and intentional tortious interference born out of documented personal animus;

3. an award of pre-judgement and post-judgment interest at the maximum legal rate; and

4. an award of Murray's reasonable attorneys' fees, expert witness fees, and all allowable costs of this ligation pursuant to federal common law equity powers under Section 301.

**COUNT TWO**

**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against the Defendant MLBPA and Defendant Clark)**

95. Murray repeats and incorporates by reference each allegation contained above.

96. Effective September 1, 2021, Murray entered into an employment agreement with WME. Pursuant to the WME Agreement, Murray was to be employed by WME for a period of six years, unless the agreement was terminated earlier in according with its terms.

97. The MLBPA and Defendant Clark possessed knowledge of Murray's contractual relations with WME, as exhibited by the fact that the MLBPA copied WME's in-house counsel on its initial letter to Murray concerning its investigation. WME also had to provide Murray's contract to the MLBPA per Agent Regulations.

98. During the period from September 1, 2021, through early April 2025, Murray and WME each performed their obligations under the WME Agreement. However, on or about April 17, 2025, WME notified Murray that it was terminating the WME Agreement and his employment effective June 1, 2025.

99. According to the WME, the reason for the termination of the WME Agreement was that the MLBPA was forcing WME to cease representing professional baseball players due to an alleged conflict of interest arising from the ownership of minor league baseball clubs by WME's indirect parent, Silver Lake Capital. As a result, WME felt it had no choice but to terminate its agreement with Murray.

100. The MLBPA's action against WME was taken despite the fact that the MLBPA had not taken action against other agents and agencies that entered into similar business arrangements.

101. Another significant reason for the WME's acceptance of the MLBPA's directive to cease representing Players and to terminate the WME Agreement was the knowledge that Murray was being investigated by the MLBPA and that the MLBPA was going to try to decertify him.

102. WME's knowledge of the MLBPA's investigation was prior to any finding pursuant to a Notice of Discipline and the investigation was conducted to intentionally harm Murray who possessed significant opportunities to enter employment and professional relationships with third parties including players, sports agencies and other companies in the sports industry.

103. The MLBPA's investigation was intended from the start to result in a pre-planned decertification of Murray by the MLBPA.

104. Upon information and belief, the decision to force WME to cease representing baseball players was dictated and/or approved by Defendant Clark.

105. As a result of the termination of his employment with WME, Murray was financially harmed.

106. But for the improper actions of the MLBPA and Defendant Clark, the termination of the WME Agreement would not have occurred.

107. But for the improper actions of the MLBPA and Defendant Clark, the term of the WME Agreement would have been extended.

108. Accordingly, as a direct and proximate result of the MLBPA and Defendant Clark's actions, Plaintiff Murray suffered extensive harm.

WHEREFORE, Plaintiff Murray seeks an Order granting equitable rescission of the Settlement Agreement and restoring Murray to his full, unrestricted status as an MLBPA-certified player agent and such other relief as this Court deems just, proper, and equitable.

## COUNT THREE

### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (Against All Defendants)

109. Murray repeats and incorporates by reference each allegation contained above.

110. Defendants knew that Murray was only entering into the Settlement Agreement with the understanding that he would be able to continue to operate in a limited capacity through a Certified Agent's supervision.

111. Moreover, Defendants knew or should have known that Murray had entered into an arrangement with Stival to serve as Murray's certified agent who would supervise the work that he was allowed to do under the terms of the Settlement Agreement.

112. However, at the time it entered into the Settlement Agreement, Defendants knew they had no intention of allowing Murray to continue with his profession in any capacity.

113. Defendants followed through with their plan to fully "rid" themselves of Murray and destroy any and all economic opportunities of Murray, by their actions in the November 13, 2025 meeting, where misrepresentations were made expressly about the Settlement Agreement, and Agents were actively dissuaded from even associating with Murray.

114. Defendants' actions specifically resulted in Stival refusing to supervise Murray.

115. It further resulted in agents not returning his calls and no agent agreeing to supervise Murray.

116. Defendants thus achieved their primary purpose from the start of their stale investigation against him, namely, to get "rid" of him.

117. The actions of Defendants have significantly harmed and interfered with the ability of Murray to obtain work in his field of employment. Such actions will continue to cause further significant harm to Murray's prospective economic opportunities.

WHEREFORE, Plaintiff Murray seeks an Order granting equitable rescission of the Settlement Agreement and restoring Murray to his full, unrestricted status as an MLBPA-certified player agent and such other relief as this Court deems just, proper, and equitable.

## COUNT FOUR

### FRAUD IN THE INDUCEMENT/EQUITABLE RESCISSION (MLBPA and Clark)

118. Murray repeats and incorporates by reference each allegation contained above.

119. During the negotiation of the proposed Settlement Agreement, Defendant MLBPA, through its executive officers and legal counsel, represented to Murray that if he signed the Agreement, he would be legally permitted to continue earning a livelihood and operating his business as an agent by executing limited player representation work under the supervision of a certified agent.

120. They also represented to his counsel that there were "no plans of making the settlement public at the time."

121. The representations by Defendant MLBPA were material representations of past and present facts regarding the structural operability and viability of the Agreement.

122. When Defendant MLBPA made these representations, they were entirely false and Defendant MLBPA knew they were false. In fact, Defendant MLBPA never intended to allow Murray to operate under the Agreement; instead, Defendants had already formulated a pre-determined, bad-faith intent to "take down" Murray and completely eliminate him from the sports representation industry.

123. Defendant MLBPA made these false representations intentionally and maliciously for the express purpose of deceiving Murray, inducing his reliance, and coercing him into surrendering his full rights to an appeal.

124. Murray reasonably and justifiably relied on Defendant MLBPA's false representations when he executed the Settlement Agreement. Had Murray known that Defendant MLBPA was concurrently planning to threaten and blacklist any certified agent who tried to work with him, Murray would have refused to sign the Settlement Agreement and would have instead immediately sought an appeal or a federal judicial stay of the union's sham disciplinary process.

125. Immediately upon securing Murray's signature, Defendant MLBPA acted out its fraudulent intent by actively threatening the agent community with possible discipline if they associated with Murray, thereby executing their pre-negotiation scheme to destroy Murray's livelihood.

126. Because Defendant MLBPA fraudulently induced Murray into executing the Settlement Agreement while actively plotting to sabotage its only viable pathway to its performance, the Settlement Agreement is void.

127. Murray has no adequate remedy at law to repair the continuous, catastrophic ruin of his professional status, and he is thus equitably entitled to a judicial rescission of the Settlement Agreement.

128. Rescission of the fraudulently induced Settlement Agreement will return the parties to the *status quo ante*, thereby fully restoring Murray to his pre-Agreement status.

WHEREFORE, Plaintiff Murray seeks an Order granting equitable rescission of the Settlement Agreement and restoring Murray to his full, unrestricted status as an MLBPA-certified player agent and such other relief as this Court deems just, proper, and equitable.

**DEMAND FOR TRIAL BY JURY**

Murray demands a trial by jury as to all issues in this case.

DATED: November 13, 2026

NAGEL RICE,LLP
Bruce H. Nagel, Esquire
(*pro hac vice* application to be filed)
Diane E. Sammons, Esquire
(*pro hac vice* application to be filed)
103 Eisenhower Pkwy
Roseland, NJ 07068
Phone: 973-618-0400
bnagel@nagelrice.com
dsammons@nagelrice.com

*Attorneys for Plaintiff*

*/s/ Alan Rosenthal*
Alan Rosenthal
Florida Bar No. 220833
arosenthal@carltonfields.com
Natalie J. Carlos
Florida Bar No. 0146269
ncarlos@carltonfields.com
Carlton Fields
2 MiamiCentral
700 N.W. 1st Avenue, Suite 1200
Miami, Florida 33136-4118
Telephone: 305-530-0050

*Attorneys for Plaintiff*